IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

LIBERTE CAPITAL GROUP,

            Plaintiff,          Case No. 5:99 CV 818

   -vs-

                            MEMORANDUM OPINION

JAMES A. CAPWILL, et al.,

            Defendant.

KATZ, J.

    This matter is before the Court on cross-motions for summary judgment on the declaratory relief asserted by the Intervenors' herein. Also before the Court are the parties' oppositions, responses and reply thereto. This Court has jurisdiction pursuant to 28 U.S.C. § 1331. For the reasons that follow, the Receivers' motion is granted and the Intervenor's motion is denied.

## BACKGROUND AND PROCEDURAL HISTORY

    By now the parties and their counsel are well aware of the origin of the above-captioned litigation so the Court need not reiterate that history in this opinion. However, a procedural history of how the Intervenors came to be involved in the present dispute is briefly set forth.

    In 2002, Ursula Linke ("Linke") and Angela Salcedo ("Salcedo"), were granted leave to intervene in this litigation to seek declaratory relief on their claims in arbitrations against Washington Square Securities, Inc ("WSSI"). Through WSSI's registered representatives, Candace A. Bloodsworth ("Bloodsworth") and William J. Guy ("Guy"), Linke and Salcedo purchased Liberte viatical investments to their detriment. Linke and Salcedo sought an

adjudication by this Court that their pending arbitration claim[1] was not encompassed by the Liberte class action herein.

After determining that Linke and Salcedo's dispute against WSSI was distinct from the Liberte class action, the Court granted Linke, Salcedo and subsequent intervenor, Larry Thompson[2] ("Thompson") leave to intervene for the sole purpose of determining who could advance the arbitration claim. In addition, the Court consolidated the claims of Thompson, Linke and Salcedo as they proposed the same arguments. (Doc. No. 2207.)

## MOTION FOR SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56©). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential

---

[1] The arbitration filed by Linke and Salcedo was stayed until a determination by this Court as to whether the claim filed with the National Association of Securities Dealers, Inc. ("NASD") was encompassed by the pending Liberte class action and therefore ineligible for arbitration. NASD Rule 10301(d)(2).

[2] Like Linke and Salcedo, Thompson filed an arbitration claim with NASD against broker Kevin M. Grunawalt and the brokerage firm of Carillion Investments, Inc. regarding his purchase of Liberte viatical settlements.

elements of the non-movant's claim. *Id.* at 323-25. Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2541, 91 L. Ed. 2d 202 (1986) (*quoting* FED. R. CIV. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *see also Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S. Ct. at 2552.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)). However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact."

*Williams*, 154 F. Supp. 2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999). Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

### DISCUSSION

*A. The Issues Presented and Relevant Orders*

The issue to be determined by this Court is who has the right to pursue the Intervenors' arbitration claims against the respective brokerage firms for the acts of their representatives–is it the individual claimants or the Receiver?

The Receiver correctly notes that the landscape of this litigation changed in the latter part of 2002 when the it became apparent that individual investors might attempt to prosecute their individual claims against agents or brokers. To that end on September 13, 2002, both Receivers filed a joint motion for an order regarding the entire issue of litigation against Liberte and Alpha agents and brokers. (Doc. No. 1727.) In an effort to stem individual actions from investors against agents and brokers, the Receivers argued in support of an order as follows:

> Individual investors should be precluded from the right to pursue agents and brokers for damages for either the recovery of commissions or the return of investments. These claims belong in this Court and should be pursued by the respective Receivers. An Order is needed from this Court to avoid the following:
>
> 1. A multiplicity of claims being brought on the same issue,
>
> 2. Individual recoveries which are not part of the comprehensive order affecting investors and therefore prejudice those investors who are not parties to that litigation.

>       3.  The danger of conflicting findings by various Courts on the same issue to the detriment of all investors.
>
>       As a result of the foregoing, movants request an Order from this Court *bringing the entire commission recovery program* under this Court's jurisdiction and precluding individual actions by individual investors on the same matters that these Receiver's are pursuing.

(Id. at p.2) (emphasis added).

During the pendency of this motion and on September 23, 2003, the Court conducted a pretrial conference followed by a  fairness hearing on the method of proposed disbursement regarding the Liberte investors.  During the pretrial conference preceding the fairness hearing,  a discussion ensued regarding of Receivers' attempts to contain individual investor suits:

| | |
|---|---|
| THE COURT: | Well, the real problem here is twofold, it seems to me, some of the real problems.  One, do the investors have a claim separate from the class, and that depends on methodology that's finally - - if we go pro rata, clearly it's the claim of the classes, is it not? |
| MR. JAVITCH: | It is. |
| MR. WULIGER: | Right. |
| THE COURT: | And if it's the claim of the class, the claim is not matured, it seems to me, until we know what the deficiency is and then we're talking about an indemnification between the amount of the distribution ultimately and the amount of the loss.  It's a nightmare.  It's a circular nightmare. |
| MR. NEWCOMER: | Investors may have other claims than just the loss of their money.  We have many other thing - - |
| MR. JAVITCH: | That's the point. |
| THE COURT: | One at a time. |
| MR. NEWCOMER: | That's going to - - they make it a judgment with exemplary damages, et cetera, etcetera, et cetera, that's not going to |

|  |  |
|---|---|
|  | have anything to do with pro rata. It's an individual claim against - - |
| MR. JAVITCH: | That's exactly the point because we're pursuing only the recovery of the commission. |
| MR. WULIGER: | No, no. Victor, we are pursuing more than that, but for purposes of resolution - - |
| MR. JAVITCH: | Right. |
| MR. WULIGER: | We have - - we have uniformly taken the position, return the commission dollars. |
| THE COURT: | Well, that's right. And so that as a practical matter, Victor's right. If someone returns the commission dollars, the case as against the receiver or receivers is done. |
| MR. JAVITCH: | Right. |
| THE COURT: | Now, that does not insulate them from any claims of the individual investors, but I don't think we can handle that here, Victor, because as Mr. Newcomer indicated, the claims may be wider than those encompassed in the class action. |

(September 23, 2002 Hearing Transcript.)

On October 2, 2002 and on the basis of the Receivers' joint motion, the Court granted the request regarding the recovery of commissions and held that "all claims against former agents and/or brokers of Alpha and Liberte for damages in contract or tort actions arising out of claims by investors are deemed to be assets of the receivership estates and must be filed by the Receivers, if at all." (Doc. No. 1758.)

Just a little over a month later, the Court determined a *pro rata* method of disbursement to the Liberte class investors to be the appropriate measure of allocation[3]. (Doc. No. 1797.)

---

[3] Ultimately, the Sixth Circuit affirmed this determination. *Liberte Capital Group v. Capwill*, Case No. 03-3330 (6th Cir. Aug. 29, 2005) (unpublished).

6

In April 2003, the Court granted another joint motion by the Receivers for an additional statement of authority. After recognizing the evolution of the litigation and the need to expand the Receivers' authority, the Court stated as follows:

> The Court has charged the Receivers in the past with representing the interests of the investors when necessary, or when it would be impracticable or impossible for them to do so on their own. Having recently determined that a pro rata distribution would be the most equitable under the circumstances, the Court is also mindful that the ultimate distribution is intended to remedy in some measure harm done to the individual investors. It is therefore
>
> ORDERED that the General Receiver and the Alpha Receiver, in keeping with the ultimate goal of maximizing the Estates for the benefit of the investors, are empowered to represent and pursue the interests of the investors directly. The Receivers shall further continue to carry out their duties and obligations as set forth by previous and existing Orders of the Court. Finally, the Receivers shall continue to coordinate their efforts with class counsel to recover, protect and preserve receivership assets.

(Doc. No. 1982.)

*B. Discussion*

The Receiver advocates that the arbitration claims of the Intervenors must be prosecuted by the Receivership as it is encompassed in the above-referenced orders; to allow the Intervenors to pursue these claims in light of the *pro rata* ruling would result in an inequitable result. The Receiver argues that as the Court has discretion to fashion an extraordinary remedy in light of the circumstances of this particular case and that allowing the Intervenors from pursuing the arbitrations themselves would subvert the interests of the investors who, unlike the Intervenors, are without the means to prosecute similar claims.

In contrast, the Intervenors dispute that their arbitration claims fall within the classification of actions which are encompassed within the Orders. Specifically, the Intervenors characterize their claims as "sales claims" against the brokerage firms for the malfeasance of their representatives. Moreover, as the brokerage firms did not receive commissions for these sales

7

from either Alpha or Liberte, the Intervenors distinguish their claims from the actions of the Receiver which seek to recover commissions from the agents/brokers. Alternatively, the Intervenors claim that the doctrine of *in parti delicto* prevents the Receiver from prosecuting these claims.

      1. <u>Are the Intervenors' Claims Distinct from Receivership Claims?</u>

In order to make a reasoned determination as to the claims asserted within the arbitration, the Court turns to the claims made by Intevenors against the respective brokerage firms[4]. The Intervenors name the respective brokerage houses in the arbitration claims and Thompson also includes the broker's representative, Grunawalt. The general allegations contend that the brokerage firms were aware of the NASD's requirements regarding regulatory and compliance problems encountered at off-site locations but ignored those directives thereby failing to comply with supervisory obligations over these off-site representatives. To that end, all the Intervenors allege the following claims: (1) violation of federal securities laws; (2) breach of the respective state securities laws; (3) breach of contract; (4) common law fraud; (5) breach of fiduciary duty; and (6) negligence and gross negligence. Both statements of claims requesting arbitration characterize the requested relief as "actual damages and rescission together with the benefit of the bargain," "consideration paid for the securities," and "actual and rescissionary damages" along with "lost opportunity costs, model portfolio damages, prejudgment interest, attorneys' fees, costs, non-economic damages, [and] punitive damages."

---

[4] Linke and Salcedo's NASD arbitration was filed on December 14, 2000 is part of the record in this action contained as Exhibit A to WSSI's motion for summary declaratory judgment (Doc. No.1784). Thompson's NASD arbitration was filed on September 27, 2002 and is also part of the record as Exhibit B to Thompson's motion to intervene (Doc. No. 1880).

The Intervenors propose a distinction between post-purchase commissions as contrasted with the investors claims that they were wrongfully induced to purchase Liberte viatical settlements. The Intervenors contend that the wrongful inducement claims can only be advanced by the investors as they are "substantially and materially different from Liberte's claims against Liberte agents for wrongful disbursement of commissions." (Intervenor's Motion at p. 16.)

In order to validate the Intervenors position, the Court must examine suits which are representative of the type of actions brought by the Receiver against various agent/brokers. While the Receiver's actions against agents and viatical brokers do indeed encompass claims for wrongfully obtained commissions, they also include the following claims and prayers for relief as follows:

> (1) securities violations under both Securities Act of 1933 and Securities Exchange Act of 1934 with the prayer seeking "an award of consideration paid by those Alpha investors whose business the Defendant solicited. . . ";
> (2) Racketeering Influenced and Corrupt Organization Act ("RICO") seeking an award of treble damages of the amount of the investment;
> (3) common law fraud seeking "an award of damages consisting of the Alpha investors' lost investment. . . ";
> (4) fraud in the inducement seeking "an award of damages consisting of the Alpha investors lost investments . . . "; and
> (5) breach of contract seeking "an award of damages consisting of the Alpha investors lost investments. . . "

*Wuliger v. Moore,* Case No. 1:03 CV 0734 (N.D. Ohio), Complaint at p. 25 (Alpha agent case).

A similar action brought against a Liberte agent seeks similar relief:

> (1) securities violations under both Securities Act of 1933 and Securities Exchange Act of 1934 with the prayer seeking "an award for the consideration paid by those Liberte investors whose business the Defendant solicited. . . ";
> (2) common law fraud seeking "an award of damages consisting of the Liberte investors' lost investments. . . ";
> (3) fraud in the inducement and breach of contract seeking "an award of damages consisting of the Liberte investors' lost investments. . ."

*Javitch v. Gibson,* Case No. 1:04 CV 0262 (N.D. Ohio), Complaint at p. 25 (Liberte agent case).

A representative case brought against a viatical broker alleges the following claims and prayers in addition to claims for commissions:

> (1) Racketeering Influenced and Corrupt Organization Act ("RICO") seeking "damages three times the amount of losses suffered by the Alpha [investors]. . ." (2) common law fraud, fraudulent misrepresentation and negligent misrepresentation seeking "compensatory damages equal to the pecuniary dollar loss suffered by Alpha Capital, to whom the life insurance policies (viatical settlements) were sold, and compensatory damages equal to the pecuniary loss suffered by Alpha Capital investors whose monies were matched to defective policies that the Defendant sold to Alpha . . ."

*Wuliger v. Washington Viatical Settlement Brokers,* Case No. 1:04 CV 1526 (N.D. Ohio), Complaint at pp. 24-25.

Having examined these representative complaints of actions against agents and brokers, the Court finds the claims and prayers for relief are not as distinct as the Intervenors present.  This is because the arbitration claims and the Receiver claims both seek liability under the same securities laws, both allege breaches of contract, common law fraud and claims sounding in negligence.  It is true that the Receiver seeks the return of commissions based upon distinct claims of unjust enrichment, breach of fiduciary duties, negligent or intentional misrepresentation and violations of the Investment Advisers Act of 1940.  However, the similarity of claims regarding the securities violations, negligence and fraudulent conduct appear to request relief akin to the investors' lost investment, albeit characterized as actual or rescissionary damages.  Such rescissionary damages are defined as "return[ing] of the injured party to the position he occupied before he was induced by the wrongful conduct to enter into the transaction."  BLACK'S LAW DICTIONARY 392 (6th ed. 1990).  These are the same compensatory damages representing the investors' lost investments which the Receiver also seeks in the myriad of federal cases currently

pending in this Court. Therefore, the Intervenors' arguments that their arbitration claims are distinct from the Receiver's civil litigation against agents and brokers, is not persuasive.

    2. <u>Receiver's Standing Per the Sixth Circuit's decision in *Javitch*</u>.

The Intervenors appear to challenge the standing of the Receiver on the basis of the Sixth Circuit's decision in *Javitch v. First Union Sec., Inc.,* 315 F.3d 619 (6th Cir. 2003). In *Javitch*, the Receiver brought suit against four brokerage firms for negligence, breach of fiduciary duties and various securities violations related to transactions undertaken by James Capwill ("Capwill"), principal of Viatical Escrow Services ("VES"), Capwill & Co. ("C & C") and Capital Fund Leasing ("CFL"). The Defendant brokerage houses moved to compel arbitration of these claims, which was denied at the trial court level and appealed to the Sixth Circuit.

The Receiver claimed that he brought the suits on behalf of the true owners of the assets, the creditors or investors who were defrauded by Capwill. In addressing the authority of the Receiver, the appellate court was cognizant of the district court's position that based upon the orders of appointment, the Receiver was, at that time, without authority to assert the claims of the investors. *Id.* at 625-626. The Sixth Circuit also noted its understanding of *McGinness v. United States*, 90 F.3d 143 (6th Cir. 1996) as follows:

> As we see it, *McGinness* does not stand for the proposition that a receiver never stands in the shoes of the entity in receivership, but suggests that the question *depends on the authority granted by the appointing court and actually exercised by the receiver.*

*Id.* at 626. (Emphasis added.) Based upon the particular orders in effect at the time, the Sixth Circuit found the Receiver, who brought the claims on behalf of VES and CFL, was "bound to the arbitration agreements to the same extent that the receivership entities would have been absent the

11

appointment of the receiver." *Id.* at 627. In a footnote to this statement, the panel stated, "Because the question is not presented by these interlocutory appeals, *we express no opinion concerning the receiver's standing to assert claims on behalf of any party other than VES or CFL, or whether such claims would be subject to arbitration.*" *Id*. at n.7. (Emphasis added.)

Beginning in 2002, the orders modifying the Receivers' authority to the present are a stark contrast to the original orders of appointment and signify the strange odyssey of this particular litigation. The Sixth Circuit did not have the precise issue presented and did not opine, contrary to the Intervenors' assertion, that the Receiver could *not* advance a suit on behalf of the investors. As the *Javitch* decision is incorrectly characterized by the Intervenors, it does not stand for the proposition that the issue of standing has already been determined. Therefore, the Intervenors' position on this issue is not well taken.

  3. <u>Equitable Considerations</u>

Federal equity receivers are appointed to take control, custody, and/or management of property involved in litigation. It is generally recognized that a receiver may bring suit to "accomplish the objective of the suit for which his or her appointment was made, or under the specific directions of the appointing court, or pursuant to his general duties to receive, control, and manage the receivership property." 12 Wright, Miller & Marcus, Federal Practice & Procedure § 2984 (2d ed. 1997). *See also,* 65 Am. Jur.2d Receivers § 129 (2d ed) (powers of a receiver flow from statute, court rules, orders of appointment and subsequent orders of appointing court).

Here, the VES, CFL and Alpha entities are defunct. Additionally, both receivers operate under the Court's directives, which are generally aimed at marshaling assets for the benefit of the

class/investors[5], among others.  The evolving nature of the *Liberte* action is evident from the orders regarding the Receiver's responsibilities following his initial appointment.  For example, in October 2000, the Court approved the request to allow the Receiver to take control of Liberte policies in order to maximize their worth "in the best interest of the investors."  (Doc. No. 777.)

This litigation and the receivership estate began with an eye towards marshaling assets for the benefit of the defrauded investors.  As late as April 2002, the Court was apprized by the Receiver's forensic accountant that tracing or matching of investors to policies was not possible, (Doc. No. 1547, Ex.A.) and that an alternate approach to disbursement was necessary.

A month later (and due to a conflict by the General Receiver Javitch), the Alpha Receiver was "authorized to commence litigation against banks who participated in illegal activities of money laundering, RICO violations, negligence, and other tortious conduct which contributed to the depletion of funds from Capital Fund Leasing and Viatical Escrow Services."  (Doc. No. 1610.)

Later that fall, the Court granted  the joint motion of the Alpha and General Receiver regarding the recovery of commissions relative to Liberte and Alpha agents/brokers.  Since the claims against agents and/or brokers sounding in contract or tort arose from claims by investors, those claims were "deemed to be assets of the receivership estates" and were only to be pursued by the Receivers. (Doc. No. 1758.)  Then in April 2003, the Court expanded the Receivers' responsibilities and authorized them "to represent and pursue the interests of the investors directly." (Doc. No. 1982.)

---

[5] The Liberte investors were certified a class as of March 2001.  (Doc. Nos. 991 and 992.)

The difficulty presented by the Intervenors' position is somewhat akin to the position of the Mize group, which sought to claim sole right to the proceeds of the Jacqueline Crivello policy. While it is true that the Intervenors, like the Mize group, seek enforcement of their contractual rights relative to their investment, their monies funneled through the broker were presumably placed into policies.  Unlike the Mize group, however, there is not an identifiable pot of money which bears their names but they instead seek reimbursement from the brokerage firms supervising the individuals who led them to invest their money into Liberte viaticals.  Despite that distinction, the result of allowing them to pursue an independent action, would be an affront to the equitable principles currently in place to the detriment of all the Liberte investors.

3. *In Pari Delicto*

The Intervenors also challenge the Receiver's ability to pursue claims based upon the doctrine of *in pari delicto*[6].  This is because James Capwill, the principal of both VES and CFL, was the chief architect in the wrongful conversion/embezzlement of investor funds.  Therefore, they argue, his wrongful acts are imputed to the entities and thereby imputed to the Receiver and preclude claims against the third parties.   This Court disagrees.

Actions by equity receivers against third parties are viable where the "wrongdoer" has been removed.  For example, in *Scholes v. Lehman,* 56 F.3d 750, 754-755 (7th Cir.), *cert. denied sub. nom, African Enterprise Inc. v. Scholes*, 516 U.S. 1029 (1995), Judge Posner provided this explanation:

> Though injured by the [corporate agent] Douglas, the corporations would not be heard to complain as long as they were controlled by him, not only because he

---

[6] In equal fault; equally culpable or criminal; in a case of equal fault or guilt.  BLACK'S LAW DICTIONARY 791 (6th ed. 1990).

> would not permit them to complain but also because of their deep, their utter, complicity in Douglas's fraud. . . But the reason, of course, . . . is that the wrongdoer must not be allowed to profit from his wrong by recovering property that he had parted with in order to thwart his creditors. That reason falls out now that Douglas has been ousted from control of and beneficial interest in the corporations. The appointment of the receiver removed the wrongdoer from the scene. The corporations were no more Douglas's evil zombies. Freed from his spell they became entitled to the return of the moneys--for the benefit not of Douglas but of innocent [creditors]--that Douglas had made the corporations divert to unauthorized purposes. That the return would benefit the [creditors] is just to say that anything that helps a corporation helps those who have claims against its assets. The important thing is that the [creditors] were not complicit in Douglas's fraud; they were its victims.
>
> Put differently, the defense of *in Parti Delicto* loses its sting when the person who is *in Parti Delicto* is eliminated. Now that the corporations created and initially controlled by Douglas are controlled by a receiver whose only object is to maximize the value of the corporations for the benefit of their . . . creditors, we cannot see an objections to the receiver's bringing suit to recover corporate assets unlawfully dissipated by Douglas.

*See also, McCandless v. Furland,* 296 U.S. 140, 56 S.Ct. 304, 80 L.Ed. 473 (1935) (participation by debtor's management or agents in wrongful conduct does not bar a receiver's action under the doctrine of *in parti delicto*).

Even in the context of a bankruptcy dispute, the imputation of wrongdoing to an innocent successor estate does not comport with the equitable doctrine of *in pari delicto*:

> A receiver, like a bankruptcy trustee and unlike a normal successor in interest, does not voluntarily step into the shoes of the [debtor]; it is thrust into those shoes. It was neither a party to the original inequitable conduct nor is it in a position to take action prior to assuming the [debtor]'s assets to cure any associated defects. . . In light of these considerations we conclude that the equities between a party asserting an equitable defense and a [debtor] are at such variance with the equities between a party and a receiver of the [debtor] that equitable defenses good against the [debtor] should not be available against the receiver. To hold otherwise would be to elevate form over substance--something courts sitting in equity traditionally will not do. . . [T]he [debtor']s inequitable conduct is not imputed to [a receiver].

*F.D.I.C. v. O'Melveny & Myers,* 61 F.3d 17, 19 (9th Cir. 1995). *See also Official Committee of Unsecured Creditors v. R.F. Laferty & Co.,* 267 F.3d 340, 358 (3d Cir. 2001).

15

Most recently, a subsidiary's receiver's suit against the parent and its officers was allowed to proceed despite the claim that the doctrine of *in pari delicto* barred the suit. *DeNune v. Consolidated Capital of North America, Inc.,* 288 F.Supp.2d 844 (N.D. Ohio, Sept. 23, 2003) (Carr, J.).

An equity receiver's duties are fashioned and may be modified by the appointing court as necessary. Because this Court has expressly given the Receivers broad authority to pursue claims sounding in "money laundering, RICO violations, negligence, and other tortuous conduct which contributed to the depletion of funds from Capital Fund Leasing and Viatical Escrow Services," the Receiver's duties herein are not limited by the bankruptcy statutes and the Receiver is not precluded from these actions under the doctrine of *in pari delicto*.

4.Reimbursement by Receiver

The Intervenors contend that they are entitled to retain the benefit of the arbitration claims as they have funded those claims with the encouragement of the Receiver and are capable of pursuing the claims without outside assistance. The initial premise of the Intervenor's position is not entirely accurate.

At the time the parties briefed the issue of whether the pending arbitration claim was encompassed by the Liberte class action, it is undisputed that the Receiver and class counsel stated in affidavits that as of March 2002, the arbitration claims did not conflict with the Receiver duties and jurisdiction. However, in the months which followed, the Receivers advised the Court of potential litigation by individual investors against agents and brokers and that prompted the subsequent orders of October 2002 and April 2003. It was these orders which changed the Receivers' positions. As noted above, the Court also ruled that a *pro rata* method of disbursement

16

was the best course of action given the impossibility of tracing assets due to the massive co-mingling by Capwill.  Therefore, at the time the Intervenors initiated their arbitration claims against the respective brokerage firms there was no conflict.

The current status of the disbursement aspect of this litigation is that an underlying dispute between the Alpha and Liberte investors, relative to the proceeds in the Receivership, has been resolved.  The Court has scheduled a fairness hearing on the settlement proposal for April 10th and will entertain objections to the proposal at that time.  If approved, an interim disbursement to the respective investors would be implemented in accordance to the *pro rata* ruling.  If this Court were to allow the Intervenors to proceed with their arbitration and, assuming it was successful, they would elevate their claims above those investors not fortunate to have the financial resources to pursue independent litigation.  This is one of the reasons why the Court authorized the Receiver to pursue claims on the investors' behalf and is in accordance with the principles of the *pro rata* ruling.

The Court is cognizant of the costs expended thus far by the Intervenors in pursuit of their arbitration claims.  The Receiver states that discussions regarding the issue of reimbursement were initiated but did not result in any progress.  This Court is confident that the parties can come to a mutually agreeable resolution on this dispute which would allow the Intervenors to continue, if they choose, to pursue the litigation, provided the proceeds of the undertaking are added to the Receivership estate and not do violence to the *pro rata* ruling currently in place.

## CONCLUSION

For the reasons stated above, the Receiver's motion for summary judgment (Doc. No. 2254) is granted and the Intervenors' motion for summary judgment (Doc. No. 2256) is denied.

The Receiver is directed to initiate discussions regarding the issue of reimbursement with the Intervenors and provide the Court a written status report on or before April 14, 2006.

IT IS SO ORDERED.

    S/ *David A. Katz*
DAVID A. KATZ
SENIOR U. S. DISTRICT JUDGE